### In re FEDERAL SYSTEM OF BAKERIES OF MARYLAND, Inc.

### In re FEDERAL SYSTEM OF BAKERIES OF AMERICA.

(District Court, D. Maryland.  February 21, 1922.)

No. 3589.

Bankruptcy ⟨⟩⟩188(2)—Validity of contract reserving title to property.

A so-called license contract, under which petitioner delivered to bankrupt certain patented ovens and other unpatented bakery tools and equipment, for a consideration equal to their full value, with the right to use petitioner's trade-mark on its products and certain secret formulas, on payment of a royalty on its sales, which contract reserved title in petitioner to all the property, with the right to retake the same on breach of conditions, *held* valid in such reservation as to the patented ovens, and the right to use the trade-mark, but invalid to give a lien on any of the unpatented articles, as against bankrupt's creditors, not being recorded as required by the laws of the state.

In Bankruptcy.  In the matter of the Federal System of Bakeries of Maryland, Inc.  On petition of the Federal System of Bakeries of America to reclaim property.  Granted in part.

⟨⟩⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Niles, Wolff, Barton & Morrow, of Baltimore, Md., for petitioner.

Clarence A. Tucker and Paul R. Kach, both of Baltimore, Md., for receivers.

Lee I. Hecht, of Baltimore, Md., for bankrupt.

ROSE, District Judge. The Federal System of Bakeries of Maryland is a Maryland corporation. It is now in bankruptcy, and will be referred to as the "bankrupt." It operated a number of bakeries in this city. The petitioner, the Federal System of Bakeries of America, is a Delaware corporation, which now has its actual headquarters at Davenport, Iowa. It will be called the "petitioner." Almost all of the equipment of the five or more establishments carried on by the bankrupt originally came from or through the petitioner, which is now seeking to repossess itself thereof.

Something over five years ago, one Feder, still connected with the petitioner, in Oakland, Cal., came across a rotary oven. He saw great advertising possibilities in the operation of such appliances in the show windows of shops' upon much-traveled highways. He obtained an assignment of the patent for the oven, which had attracted his notice, and, having convinced some others that his idea was likely to prove profitable, they and he put it into practice. After various reorganizations and transfers of headquarters, the petitioner took over the scheme, which, by that time, if not earlier, had developed into what it calls the "System," under which it says some 450 bakeshops are now operated. Every one of them is called a "Federal" bakery. The word is stamped on every loaf of bread baked in them, and constitutes petitioner's nationally registered trade-mark.

Originally the patent purchased by Feder was that under which the licenses to these various establishments purported to be issued, but before the bankrupt came into existence the petitioner, in its agreements with so-called licensees, had ceased to refer to that particular patent, and the invention supposed to be covered by it, and had substituted in its place two subsequently applied for by Feder himself. At the hearing, little was said about them. They do not appear to be basic, and no explanation has been vouchsafed as to their real value in the industry. The petitioner, of course, uses the trade-mark, and has accumulated a number of formulas and recipes. Whether there is anything out of the ordinary in any of them does not appear. It has sometimes sought to be the exclusive seller to its licensees of flour, raisins, and perhaps other staple raw materials, or to act as their purchasing agent for such articles. There might obviously be some advantages, both to it and its licensees, under some conditions, in such wholesale marketing, but in practice it would appear that it had not been possible always to realize them.

In the agreements with the bankrupt, which it is stated are of the same general character as those into which it has entered with many other individuals, copartners, and corporations, much is said of a "Federal System," and of the grant by the petitioner of the right to its benefits. What they are, other than the freedom to use the patents, trade-mark, and formulas, is not altogether easy to make out. The persons

active in petitioner's management are perhaps all the better able to speak impressively of the "system," in that, like other devout worshippers, they adore rather than analyze.

In the fall of 1918, two brothers named Strasburger, who had been in the liquor business until unfriendly legislation made it unlawful, thought there was money to be made by becoming the "Federal" bakers of Baltimore. They entered into negotiations with the petitioner and with one Braucker, also of Davenport, who had some months before acquired a "Federal" license for these parts. As the result, the bankrupt was incorporated; a majority of the stock being taken by the Strasburgers and others associated with them, and about 175 shares, of the par value of $100 per share, being subscribed for by persons connected with the petitioner. The bankrupt paid Braucker a number of thousands of dollars for his rights, and on October 24, 1919, accepted a so-called license agreement from the petitioner.

This instrument set forth that the petitioner was the owner "of the rights in and to a certain 'System'" which "includes the making and selling of bread and rolls and other such food products as may from time to time be authorized by the licensor in writing, * * * "the formulas under which the same are made, the ovens used in connection therewith (said ovens comprising the invention described in application for letters patent of the United States, being serial number 244,087, allowed March 28, 1919, and serial number No. 272,-445, allowed March 21, 1919, respectively, and sundry improvements thereto), the items and articles constituting the equipment for said system and method of display." Then the petitioner granted the bankrupt, as licensee, the exclusive rights to the use of the System for Baltimore, including the exclusive rights, as licensee, to the use of the ovens incorporating the inventions, and any improvements thereon and additions thereto which might be made for and on behalf of the petitioner, or to which it should become entitled.

The bankrupt was further given the option to set up stores under the System in other Maryland towns, provided it exercised it within 48 hours after it was notified that someone else was ready to do so. The petitioner was to furnish bankrupt the formulas to be used in making all Federal products. The bankrupt was to use them, and no others, and was to keep them secret. The license was to continue during the life of either of the patents which might be issued under the applications mentioned, or any extensions thereof, as well as that of any patent or patents issued to or for the benefit of the petitioner, or to which it should became entitled, and granted for improvement or additions to the inventions described in such applications, or either of them.

The bankrupt was to open not less than 10 stores in Baltimore within 2 years from January 1, 1920, at the rate of one unit every 90 days, and was to continue to operate them during the life of the license and agreement. These stores were always to be on the first or ground floor of a building, with a window facing the street, and at least one oven was to be installed in such window, so as to be visible to passers-by. The bankrupt was to buy all flour and raisins from the petitioner,

who was to sell the same at a price at least as low as the market price in Baltimore. The bankrupt's stores were to be used exclusively for the making and selling of bread and rolls, and such other articles as from time to time the petitioner might in writing authorize. No other articles or equipment, other than that furnished by petitioner, were to be ever kept in any of such stores, without petitioner's written permission.

The bankrupt was, during the existence of the agreement, to pay the petitioner a royalty of 3 per cent. on the gross receipts from all goods manufactured and sold by it. The right of inspection of stores, books, and accounts was reserved by petitioner. The equipment of these stores was to be obtained by bankrupt from petitioner, and, for each single-oven unit sold the bankrupt, the bankrupt was to pay the petitioner $3,775, and for each two-oven unit $5,000. These units, in addition to the patented ovens, comprised an assortment of baker's tools and equipment, none of which were patented, and in none of which petitioner had any peculiar rights. The testimony shows that, at the price charged, it would have been amply worth any one's while to sell the equipment. The bankrupt was to pay for the replacement parts, and was to secure them from the petitioner. It was to keep the equipment insured, apparently in its own name, and to pay all taxes thereon. Nevertheless it was expressly declared that all the ovens and other equipment should remain the sole and absolute property of the petitioner, subject only to bankrupt's right of use. Upon the failure of the bankrupt to make the payments required, or to perform any other part of the agreement, its right to use the oven and other equipment was absolutely to cease, and petitioner became entitled to the immediate return of all ovens and other equipment forming part of the System as its sole and absolute property, "without the payment of any sum whatever" to the bankrupt.

The bankrupt's business life, was troubled, and its relations with the petitioner were not always agreeable to either. Various disputes arose. The bankrupt charged that the petitioner had not fulfilled its contract as to the price at which flour and raisins would be sold, and set up other alleged breaches. The petitioner asserted, with truth, that the bankrupt was in arrear in the payment of royalties. There was much friction. Finally, in December, 1920, Mr. Hecht, a director and counsel of the bankrupt, and another of its officers, went to Davenport and spent some days in consultation with petitioner's officers. The result was a new agreement, in which a number of concessions were made to the bankrupt. Most of them have no direct bearing upon the questions here in issue, and throw no light upon them. In addition to a waiver of the arrears of royalty and certain other pecuniary advantages given bankrupt, it received the sole right to establish Federal bakeries in Maryland, and was released from any binding obligation to set up any more than it had already in operation. The new or substituted agreement was made out upon a printed form, in most important respects similar to, if not identical with, that used at the time the first agreement was entered into. Upon this blank was written with a typewriter:

"The consideration of this license is full payment, herewith acknowledged, for seven installations now operated by the licensee in the state of Maryland."

Mr. Hecht, who on behalf of the bankrupt negotiated the new arrangement, said that he understood the petitioner thereby intended to surrender all claim to ownership of the ovens and other equipment. The petitioner did not produce as witnesses those who had acted for it in these negotiations, but it strenuously denies that it ever for a moment contemplated surrendering what it insists was, from its standpoint, the vital portion of its whole license system. It says that all the clause in controversy really means is that the bankrupt had paid for the license all other than the royalty it was bound to pay, and was relieved from any obligation to make further installations in Maryland. The words employed were chosen by petitioner. They are not very apt for the expression of the meaning it now says they have, but, on the other hand, its construction of them harmonizes with the printed portions of the license agreement, as that contended for by the bankrupt will not. The trustee for the bankrupt relies upon the rule that ambiguous language is to be construed against its author, and that, when what is written in the blank is inconsistent with an uneliminated printed provision, the former must control.

The subsequent conduct of the parties throws little additional light upon the merits of their respective contentions as to what this added language was intended to mean, except that it does tend to establish the good faith with which each now maintains its own view. The bankrupt was so certain of its position that it undertook to put a chattel mortgage on the property now in controversy. Two of the petitioner's officials were directors of the bankrupt. Neither of them were present at the meeting at which the mortgage in question was authorized, but, as usual, a copy of the minutes thereof was sent to them, apparently without any suspicion that they would make any objection to what had been done. On the other hand, so soon as they received the copy, they made immediate and emphatic protest. Neither side receded from its position, and a couple of months later, to be exact, September 8, 1921, when both were represented at a directors' meeting, it was found equally impossible to reach a common point of view as to whether the mortgagees, who were the Strasburgers, or the petitioner, had the first claim upon the equipment.

Together they represented practically all the stockholders, and the immediate necessities of the situation forced them to agree as to what should be done to meet the bankrupt's other pressing demands. They accordingly entered into an agreement between themselves, which they also united in making a part of the minutes of the bankrupt's directors. In substance it provided that all debts created since August 1, 1921, should be paid; a note due a bank should be reduced $500 a month; all debts other than those owing the Strasburgers and the petitioner, created before August 1, should be paid pro rata before anything was given to either of them, and that the $6,000 note, dated July 1, 1921, in favor of one of the Strasburgers, to secure which the mortgage was given, and all royalties and other claims due and owing the petitioner prior to August 1, 1921, were to be paid pro rata, irrespective of due

dates. There was then added an express understanding that the parties to the agreement did not waive any right to any preference on account of any contract, agreement, or otherwise, but merely waived the time of payment, for the benefit of the bankrupt. The petitioner further undertook to furnish for one year a manager for the bankrupt. It appears that this was done, and at the time of the bankruptcy, and for some while before, such person managed its business.

From this recital of the facts, some conclusions are clear enough. The petitioner had, or at least may have had, the exclusive rights to two things: (1) Its patented ovens; (2) the word "Federal" as a trade-mark for baker's products. The first it might unquestionably license on such terms as to initial payment and subsequent royalties and retention of property rights as it might find any one willing to accept. It may, for the purposes of this case, be assumed, without deciding, that petitioner might license other people to use its trade-mark, although by such assumption no expression of opinion on the legal issue involved is intended. It is sufficient that, for the immediate purpose in hand, it is immaterial what limitations, if any, there may be upon the right of an owner of a trade-mark to grant licenses to use it to an indefinite number of other people. Such secret formulas as it had for making bread and rolls, and similar products, it might permit others to use, also upon such terms as might be mutually agreed upon. Apart from these three things, there was nothing in which it had any monopolistic right, and, except to the extent that its so-called system was embodied in them, it had no property right in it. All the world was entitled to use all there was of merit in it, so far as that might be done without infringement upon the petitioner's patents or registered trade-mark, or without breaking a contract under which petitioner had communicated its secret formulas. Unpatented mixers, racks, troughs, counters, ice boxes, ash cans, and the like remained mixers, racks, troughs, counters, ice boxes, and ash cans, no matter how often petitioner called them a part of its System.

The petitioner's counsel do not, as I understand, question any of these propositions; but they say any one may lend a chattel without consideration, or hire it upon any consideration, or for any length of time, and may reclaim it whenever the contract authorizes him to do so. Such agreement, it is true, may sometimes operate as a trap for creditors, and the Legislature may, if it shall see fit, require that it shall be recorded, upon a penalty of allowing any creditor of the bailee to ignore it; but Maryland has never seen fit to pass any such statute. To this the trustee in bankruptcy answers that he is not concerned with the limitations to which these, as most other legal propositions must be subject, such as, for example, may be inspired by a policy of law similar to that which for many centuries has prohibited the creation of unusual tenures in land, or has forbidden perpetuities, and so on. In his view the doctrine upon which the petitioner seeks to rely, whether it be sound or not, has no real application to the facts in the instant case. As he sees it, the petitioner actually sold the unpatented chattels, and received full price for them. It turned them over to the bankrupt, and required the latter to accept all the responsibilities of owner-

ship, such as keeping them insured in its own name, paying taxes on them, keeping them in repair, and replacing them when worn out. The bankrupt, so long as it kept its agreement, was in every sense their owner. It might and was expected in ordinary course to use up the particular chattels transferred to it. In short, there was only one limitation upon its full ownership. If it became indebted to the petitioner for royalties, or upon other account, or in any other respect broke its contract, the petitioner might repossess itself of the property.

Now, call this contract what you will; it is in reality nothing more than an attempt to fix a lien upon the property of the bankrupt, as security for the performance of the bankrupt's undertakings. That may be done, but only by a paper executed and recorded in the manner the statutes of Maryland prescribe. The testimony of petitioner's own general counsel that the reservation of the title was but nominal, and that the rights under it were never to be enforced, except under circumstances in which there was danger that the equipment might pass into competitor's hands, is illuminating.

It is quite natural that the two parties to the modified agreement of December, 1920, might have very different views as to what was intended. On the whole, I am satisfied that, as to the unpatented articles, the rights conferred upon the bankrupt by the petitioner were inconsistent with the retention of any substantial property right in the petitioner—at least as against creditors of the bankrupt, and so far as concerns these articles, it is immaterial what is the construction which should be put upon the amended agreement, as it is also unnecessary to determine what effect, if any, the agreement of September 8, 1921, might have by way of estopping the petitioner from setting up its claim as against those of the creditors, whom it there agreed should be first paid.

I am, however, strongly persuaded that the petitioner never intended to permit its patented ovens, during the life of the patent, which still has many years to run, to pass out of its control. No public policy was contravened by its retaining the ownership of these patented devices, and I am therefore disposed, as to them, to resolve all otherwise doubtful questions in favor of the right of the petitioner to repossess itself of these ovens.

Its petition, therefore, will be sustained, so far as concerns the ovens, and the word "Federal" must be removed from the pans before they are disposed of by the trustee. In other respects, the petition will be dismissed.